# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SONJA M. PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:11-cv-01372-TWP-TAB |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Sonja M. Phillips ("Ms. Phillips"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Ms. Phillips's application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

## I.    BACKGROUND

Ms. Phillips was born in 1972, is a high school graduate, and has an associate degree in paramedic science. Dkt. 14-2 at 45. Ms. Phillips alleges an impairment onset date of February 22, 2002. Dkt. 14-5 at 121–23. Her only relevant work experience was as a paramedic, Dkt. 14-2 at 52, and she worked as a paramedic until February 2003 when her impairment caused her to stop. Dkt. 14-2 at 35–36. Her symptoms included dizziness, anxiety, loss of concentration, nightmares, and vomiting or dry heaving before going to work. Dkt. 14-2 at 36. Although Ms. Phillips stopped working in 2003, she did not apply for DIB until 2007 because she was terrified of applying for the benefits and thought she would get better. Dkt. 14-2 37, 35. Ms. Phillips was 36 years old on the date last insured. Dkt. 14 at 25, 45.

## A.      Procedural History

Ms. Phillips filed an application for DIB on January 19, 2007, alleging disability since February 22, 2002 due to depression, post-traumatic stress disorder, and anxiety.  Dkt. 14-5 at 121–23.   Her claim was denied on June 13, 2007, Dkt. 14-4 62–65, and again after reconsideration on March 26, 2008.  Dkt. 14-4 68–70.  Ms. Phillips requested a hearing before an Administrative Law Judge ("ALJ") on May 26, 2008.  Dkt. 14-4 at 71–72.  The ALJ held a hearing on May 19, 2010 at which Ms. Phillips (with the assistance of a non-attorney representative) and a vocational expert testified.  Dkt. 14-2 at 31–59.

On June 8, 2010, the ALJ found Ms. Phillips not disabled and that she was limited to jobs requiring no stringent speed or production requirements, in a stable work setting, and with only occasional interaction with supervisors, co-workers, and the public.  Dkt. 14-2 at 18.  The ALJ also found Ms. Phillips could perform a significant number of jobs in the national economy despite her limitations. Dkt. 14-2 at 14–26.  Ms. Phillips requested review of the ALJ's decision by the Appeals Council on July 19, 2010.  Dkt. 14-4 at 120.  Her request was denied and the ALJ's decision became the Commissioner's final decision.  Dkt. 14-2 at 1.  Ms. Phillips initiated this civil action for judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g).

## B.      Medical History

### 1.      Patrick Foley, M.D.

On February 27, 2003, Ms. Phillips saw Dr. Patrick Foley ("Dr. Foley") as a new patient complaining of dizziness and episodes of lightheadedness. Dkt. 14-7 at 297. Dr. Foley recommended blood and other tests.  At a follow-up appointment on March 5, 2003, Dr. Foley discussed test results and the possibility of hypothyroidism.  Dkt. 14-7 at 297.  On March 25,

2003, Dr. Foley noted that thyroid testing was normal, but that Ms. Phillips reported suffering from insomnia and feeling "so bad" for the past two to three years.  Dkt. 14-7 at 297.  Dr. Foley opined that Ms. Phillips's symptoms were due to depression and recommended a trial of Zoloft.  Dkt. 14-7 at 297.  On April 15, 2003, Dr. Foley followed up with Ms. Phillips who reported that the Zoloft helped with her sleep, irritability, and mood swings, but she was feeling increased anxiety.  Dkt. 14-7 at 296.  Dr. Foley prescribed Lexapro and encouraged Ms. Phillips to decrease her work shift from twenty-four to twelve hours.  Dkt. 14-7 at 296.  At a follow-up appointment on May 13, 2003, Ms. Phillips stated that she was feeling poorly and reported continued spontaneous crying spells.  Dkt. 14-7 at 296.  Dr. Foley and Ms. Phillips decided to continue Lexapro to see if Ms. Phillips would improve.  Dkt. 14-7 at 296.

On May 19, 2003, Ms. Phillips called Dr. Foley's office for a new prescription.  Dkt. 14-7 at 296.  Ms. Phillips reported that her insomnia and spontaneous crying spells had returned, that she was having suicidal thoughts, and that she had written her husband a suicide note.  Dkt. 14-7 at 296.  Thereafter, on May 21, 2003, Ms. Phillips was admitted to St. Vincent Hospital and Health Services for increased symptoms of what appeared to be post-traumatic stress disorder ("PTSD").  Dkt. 14-7 at 252–53.  While hospitalized, Ms. Phillips began taking a combination of Xanax, Lexapro, and Sonata.  Dkt. 14-7 at 252.  Ms. Phillips followed up with Dr. Foley on June 3, 2003.  Dkt. 14-7 at 296.  Dr. Foley noted that Ms. Phillips was attending a partial hospitalization program from 9:00 a.m. until 3:00 p.m. every day through June 23, 2003, and afterward would enter an outpatient program.  Dkt. 14-7 at 296.  Additionally, he noted that Ms. Phillips was feeling "much better" and seemed positive about her situation.  Dkt. 14-7 at 206.  Ms. Phillips saw Dr. Foley for unrelated issues in September 2003.  Dkt. 14-7 at 295.  Ms. Phillips saw Dr. Foley on December 29, 2003 to "discuss disability."  Dkt. 14-7 at 295.  At that

appointment, Dr. Foley noted Ms. Phillips had been seeing a psychiatrist, Dr. Knable, and was taking Zoloft and Klonopin.  Dkt. 14-7 at 295.  Dr. Foley noted Ms. Phillips had PTSD and suggested Ms. Phillips provide disability paperwork to Dr. Knable.  Dkt. 14-7 at 295.

### 2.     Methodist Medical Group Behavioral Health Services

Debra Troyer Buck, Ph.D. ("Dr. Buck") of Methodist Medical Group ("MMG") began treating Ms. Phillips on June 30, 2003.  Dkt. 14-7 at 306–10.  Ms. Phillips reported a depressed mood, eating changes, weight changes, moodiness, decreased energy, sleep disturbance, anger, and anxiety.  Dkt. 14-7 at 306.  Ms. Phillips reported physical symptoms of gastrointestinal upset and dizziness.  Dkt. 14-7 at 307.  Dr. Buck's examination revealed no suicidal thoughts or potential for harm to self.  Dkt. 14-7 at 307. Dr. Buck noted Ms. Phillips had withdrawn behavior, fair judgment, slowed speech, guarded thought process, feelings of worthlessness, a flat and sad effect, slowed motor activity, and a history of significant trauma.  Dkt. 14-7 at 309. Dr. Buck diagnosed PTSD, major depression, and ruled-out dependent traits.  Ms. Phillips's global assessment functioning ("GAF") score was 52.[1] Dkt. 14-7 at 309. Dr. Buck's recommendation was that Ms. Phillips should return for continued assessment and treatment. Dkt. 14-7 at 309.

However, the next treatment entry for MMG is dated September 26, 2006 when Ms. Phillips returned to see the attending psychiatrist at the facility for medications.  Dkt. 14-7 at 304.  Ms. Phillips has presented no records or other evidence of treatment at MMG between 2003 and 2006.  At her September 26, 2006 appointment, Ms. Phillips reported that everything was going well and that she was less afraid to leave her house.  Dkt. 14-8 at 360.  She further reported her medications were working well.  Dkt. 14-8 at 360.  On October 30, 2006, Ms. Phillips saw Dr. Buck.  Dkt. 14-8 at 361.  Ms. Phillips reported Dr. Knable had changed her

---

[1] A GAF score of 51-60 denotes moderate symptoms.  DSM-IV-TR 32–34.

medication and complained of increased depression and anger due to the medication change. Dkt. 14-8 at 361.  A mental status examination revealed tearfulness, a sad mood, and anxiety. Ms. Phillips was diagnosed with major depression and a history of PTSD.  Dkt. 14-8 at 361.  Dr. Buck noted Ms. Phillips was "much improved" but "continues with or recurrence of acute presenting symptoms."  Dkt. 14-8 at 361.  On November 13 and December 7, 2006, Ms. Phillips cancelled her appointments with Dr. Buck less than twenty-four hours before the sessions.  Dkt. 14-8 at 362.

On January 18, 2007, Ms. Phillips attended therapy with Dr. Buck and reported she recently moved into a new house with her family.  Dkt. 14-8 at 364.  Dr. Buck reported that Ms. Phillips was conflicted, tearful, and stressed.  Dkt. 14-8 at 364.  Dr. Buck noted that Ms. Phillips's medications were prescribed by Dr. Knable.  Dkt. 14-8 at 364.  Ms. Phillips was seen for medication management with Dr. Knable on January 29, 2007, and her medications were renewed.  Dkt. 14-8 at 365.

On February 12, 2007, Ms. Phillips cancelled her session, and on March 1, 2007, Ms. Phillips was a "no show" to her session with Dr. Buck.  Dkt. 14-8 at 366–67.  On March 19, 2007, Ms. Phillips had an emergency session with Dr. Buck.  Dkt. 14-8 at 368.  Ms. Phillips reported that she was very upset about the process of applying for disability.  Dkt. 14-8 at 368. Dr. Buck reported that Ms. Phillips was much calmer after the session.  Dkt. 14-8 at 368.

On April 16, 2007, Ms. Phillips returned to see Dr. Buck and reported she was not doing well.  Dkt. 14-8 at 369.  Dr. Buck noted that Ms. Phillips was "much improved" but "continues with or recurrence of acute presenting symptoms."  Dkt. 14-8 at 369.  Ms. Phillips reported problems including a depressed mood, decreased energy, feelings of hopelessness and worthlessness, anger, anxiety, panic attacks, and a history of trauma.  Dkt. 14-8 at 370.  Ms.

Phillips next saw Dr. Buck on April 30, 2007, she stated that she was very anxious and depressed due to her upcoming disability evaluation, and Dr. Buck noted she appeared to be tearful at times.  Dkt. 14-8 at 371.  Dr. Buck diagnosed Ms. Phillips with major depression and a history of PTSD, and noted she was "somewhat improved."  Dkt. 14-8 at 371.

On June 7, 2007, Ms. Phillips met with Dr. Buck.  Dkt. 14-8 at 372.  Ms. Phillips reported that the disability evaluation was very stressful, but she was still enjoying her new house and was selling things on eBay.  Dkt. 14-8 at 372.  Dr. Buck noted that Ms. Phillips's affect was "appropriate" and she was "somewhat improved."  Dkt. 14-8 at 372.  Ms. Phillips's next session with Dr. Buck was on June 21, 2007.  Dkt. 14-8 at 373.  Ms. Phillips was upset and tearful that her disability claim was denied.  Dkt. 14-8 at 373.  Dr. Buck noted Ms. Phillips was very depressed.  Dkt. 14-8 at 373.

On July 17, 2007, Dr. Buck noted Ms. Phillips was a "no show" to her session.  Dkt. 14-8 at 374.  During a follow-up visit on August 7, 2007, Dr. Buck reported Ms. Phillips was angry and tearful because her disability claim was denied.  Dkt. 14-8 at 375.  Dr. Buck also noted Ms. Phillips's progress was deteriorating, but that Ms. Phillips was less tearful when not talking about the denial.  Dkt. 14-8 at 375.  Dr. Buck diagnosed Ms. Phillips with major depression, a history of PTSD, and ruled-out panic disorder with agoraphobia.  Dkt. 14-8 at 375.  On September 5, 2007, Ms. Phillips was seen for medication management with complaints of frustration, irritability, poor concentration, social phobia, low self-esteem, and increased crying.  Dkt. 14-8 at 376.  A mental status examination revealed tearfulness, feelings of hopelessness, and fair insight.  Cymbalta was added to her other medications.  Dkt. 14-8 at 376.  On September 27, 2007, Ms. Phillips was a "no show" to her session with Dr. Buck.  Dkt. 14-8 at 377.

On October 9, 2007 at a medication appointment with Dr. Knable, Ms. Phillips reported medication side-effects of muscle cramping and dizziness.  Dkt. 14-8 at 379.  She also reported increased insomnia and tearfulness, but that she liked the new medication "better" and did not "feel as out of it."  Dkt. 14-8 at 378.  Ms. Phillips was prescribed Ambien to address her sleep problems.  Dkt. 14-8 at 379.  Ms. Phillips reported some improvement after her medications had been adjusted at a follow-up visit with Dr. Buck on October 15, 2007.  Dkt. 14-8 at 380.  The mental status examination noted tearfulness, sleep problems with nightmares, and confusion when stressed, but also that Ms. Phillips was alert, oriented, and had a logical and sequential thought process. Dkt. 14-8 at 380. Ms. Phillips cancelled her next session with Dr. Buck, scheduled for November 29, 2007. Dkt. 14-8 at 381.

The next treatment note is from March 5, 2008, in which Dr. Buck noted Ms. Phillips was "returning to therapy due to continued depressed and anxious mood," Dkt. 14-8 at 382, and that Ms. Phillips had not attended therapy since October 2007.  Dkt. 14-8 at 384.  Ms. Phillips reported continued depression with anxiety.  Dkt. 14-8 at 382.  An examination revealed poor hygiene and a sad affect and mood.  Dr. Buck diagnosed moderate recurrent major depression and chronic PTSD.  Dkt. 14-8 at 382.  On April 9, 2008, Ms. Phillips was seen by Dr. Knable for a medication check and she reported that her medication was working better, but that she had continued problems with concentration and word finding, feeling frustrated, and social phobia.  Dkt. 14-8 at 385.  A mental status examination revealed a restricted mood and affect, but Dr. Knable noted Ms. Phillips was "somewhat improved."  Dkt. 14-8 at 385–86.

In a letter dated May 1, 2008, Dr. Buck reported that Ms. Phillips had been seen since June 2003 for major depression and PTSD.  Dkt. 14-8 at 400.  She stated that Ms. Phillips reported difficulties with social functioning, leaving her home unattended, and handling stress

7

associated even with simple tasks.  Dkt. 14-8 at 400.  Dr. Buck opined that Ms. Phillips had been

unable to maintain gainful work outside of her home beginning in 2003 and that there was no

indication Ms. Phillips's condition would change in the next year.  Dkt. 14-8 at 400.

On June 12, 2008, Ms. Phillips attended therapy with Dr. Buck.  Dkt. 14-8 at 387.  Ms.

Phillips reported continued social anxiety and depression, and she discussed selling items on

eBay, but that she was fearful of continuing because of changes made by eBay's new CEO.  Dkt.

14-8 at 387.  Dr. Buck noted sad affect and mood. Dkt. 14-8 at 387.  Dr. Buck diagnosed major

depression and PTSD and encouraged Ms. Phillips to continue selling items on eBay, if she

remained healthy. Dkt. 14-8 at 388.  Ms. Phillips's GAF score was 42.[2]  On July 1, 2008, Ms.

Phillips saw Dr. Buck and reported she was "doing better", "trying to be proactive" to relieve her

stress and felt good about selling a number of items through the Trader which allowed her to

contribute money ($2,500.00) for her family.  Dkt. 14-9 at 523.  Ms. Phillips was seen by Dr.

Knable on July 8, 2008 for a medication check.  Dkt. 14-9 at 494.  Dr. Knable noted that Ms.

Phillips was doing somewhat better and she reported feeling relief.  Dkt. 14-9 at 494.  Ms.

Phillips further reported she was working on social phobias and was pushing herself to do

different tasks.  Dkt. 14-9 at 494.

Dr. Buck completed a Psychiatric/Psychological Impairment Questionnaire dated July 9,

2008. Dkt. 14-8 at 392–99.  Dr. Buck listed Ms. Phillips's diagnoses as major depression and

PTSD, and again noted a GAF score of 42.  Dkt. 14-8 at 392.  It stated that Ms. Phillips had

"variable" treatment. Dkt. 14-8 at 392. Clinical findings included poor memory, mood

disturbances, emotional instability, recurrent panic attacks, feelings of guilt/worthlessness,

difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat, or inappropriate

<hr>

[2] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR 34.

affect, decreased energy, intrusive recollections of a traumatic experience, and generalized persistent anxiety.  Dkt. 14-8 at 393.  Ms. Phillips's primary symptoms were anxiety, depression, and social anxiety. Dkt. 14-8 at 394. Dr. Buck reported that the symptoms and limitations detailed in the questionnaire were present since 2003.  Dkt. 14-8 at 399.

Dr. Buck opined that Ms. Phillips was markedly limited (defined as effectively precluded) in her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; her ability to work in coordination with or proximity to others without being distracted by them; her ability to make simple work related decisions; and her ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dkt. 14-8 at 395–96.  Ms. Phillips was also markedly limited in her ability to ask simple questions or request assistance; her ability to accept instructions and respond appropriately to criticism from supervisors; and, her ability to travel to unfamiliar places or use public transportation.  Dkt. 14-8 at 396–97.   Dr. Buck also reported several categories of mild or moderate limitations.  Dkt. 14-8 at 395–97.

Further, Dr. Buck opined that Ms. Phillips experienced episodes of deterioration or decompensation in stressful settings that caused her to withdraw and/or experience exacerbated signs and symptoms. Dkt. 14-8 at 397. Dr. Buck opined that Ms. Phillips was incapable of handling even low stress work.  Dkt. 14-8 at 398.  It was noted that Ms. Phillips experienced good days and bad days. Dkt. 14-8 at 398.  Dr. Buck estimated that Ms. Phillips would be absent from work, on the average, more than three times a month due to her impairments or treatment. Dkt. 14-8 at 399.

Ms. Phillips next saw Dr. Buck on October 28, 2008, and in treatment notes Dr. Buck stated, "[Ms. Phillips] reported that she is returning to therapy due to continued mild depression and anxiety." Dkt. 14-9 at 520. Ms. Phillips reported having bad dreams, depression, and anxiety, as well as flashbacks of traumatic events from her job as an EMT. Dkt. 14-9 at 520. A mental status examination revealed Ms. Phillips was sad and she was given a GAF score of 42. Dkt. 14-9 at 521. The next treatment notes from Dr. Buck are from January 13, 2009, when Ms. Phillips reported increased depression related to conflicts with her mother. Dkt. 14-9 at 517. Her mood and affect were sad. Dkt. 14-9 at 517. Dr. Buck diagnosed Ms. Phillips with moderate recurrent major depression and chronic PTSD with a GAF score of 42. Dkt. 14-9 at 518.

Ms. Phillips followed up with Dr. Buck on February 5, 2009, and reported depression and memories of her days as an EMT. Dkt. 14-9 at 514. Dr. Buck listed several symptoms of depression and noted Ms. Phillips was tearful. Dkt. 14-9 at 514. On March 2, 2009, Ms. Phillips saw Dr. Buck and reported she had been having a rough time, was anxious and depressed, and was having flashbacks. Dkt. 14-9 at 511. Dr. Buck noted that Ms. Phillips was not tearful, but anxiety was prominent. Dkt. 14-9 at 511.

Ms. Phillips next saw Dr. Buck on May 4, 2009. Dkt. 14-9 at 508. Ms. Phillips reported having a "down day," was anxious and depressed, and scared of getting a second psychiatric opinion. Dkt. 14-9 at 508. Dr. Buck noted Ms. Phillips was tearful and had sad affect and mood. Dkt. 14-9 508–09. Ms. Phillips met with Dr. Buck again on June 30, 2009, when Ms. Phillips reported she had been diagnosed with diabetes and as a result had to discontinue Cymbalta. Dkt. 14-9 at 505. Dr. Buck noted that Ms. Phillips remained depressed and irritated, but that she had been experiencing a fuller range of emotions since discontinuing Cymbalta. Dkt. 14-9 at 505.

10

Also, Dr. Buck noted that Ms. Phillips was not tearful and would start Prozac[3] once the diabetes was controlled.  Dkt. 14-9 at 505.  Ms. Phillips followed up with Dr. Buck on July 20, 2009. Dkt. 15-9 at 502.   Ms. Phillips reported continued anxiety, depression, and post-traumatic episodes. Dkt. 14-9 at 502. Dr. Buck diagnosed Ms. Phillips with mild recurrent major depression and chronic post-traumatic stress disorder.  Dkt. 14-9 at 502.

In a letter dated July 21, 2009, Dr. Buck reported that Ms. Phillips was treated for major depression and PTSD with therapy and medications, including Klonopin, Prozac, and Ambien. Dkt. 14-8 at 415.  She further reported that Ms. Phillips attributed a recent increase in symptoms to a request for a second psychiatric opinion related to her evaluation for disability.  Dkt. 14-8 at 415.  Dr. Buck opined that it was in Ms. Phillips's best interest not to undergo any evaluations with medical sources she was not familiar with.  Dkt. 14-8 at 415.

Dr. Buck next saw Ms. Phillips on August 18, 2009.  Dkt. 14-9 at 499.  Ms. Phillips reported that the Prozac was working better, but she still had "lows" where she cried.  Dkt. 14-9 at 499.  Dr. Buck noted that Ms. Phillips discussed doing household tasks such as dishes and making dinner, but that the tasks were difficult.  Dkt. 14-9 at 499.  Following the appointment, Dr. Buck completed a second Psychiatric/Psychological Impairment Questionnaire.  Dkt. 14-8 at 417–24.  She stated Ms. Phillips's treatment frequency was every two to three weeks.  Dkt. 14-8 at 417.  Ms. Phillips's current GAF score was 54.  Dkt. 14-8 at 417.  Dr. Buck's findings were largely unchanged from the previous questionnaire and she opined Ms. Phillips was unable to maintain employment.  Dkt. 14-8 at 422.  On August 24, 2009, Ms. Phillips saw Dr. Knable for a medication management visit.  Dkt. 14-9 at 481.  Ms. Phillips complained of some anxiety and sleep problems, but reported that she could think more clearly on Prozac.  Dkt. 14-9 at 481.  Ms.

---

[3] Prozac is indicated for the treatment of major depressive disorder.

Phillips was diagnosed with chronic PTSD and was labeled "somewhat improved." Dkt. 14-9 at 481–82.

On November 3, 2009, Ms. Phillips's medications were renewed. Dkt. 14-9 at 479. Ms. Phillips returned to see Dr. Buck on November 9, 2009 with complaints of depression and anxiety, but stated that her medication was at the right level. Dkt. 14-9 at 496. Dr. Buck reported Ms. Phillips was "much improved." Dkt. 14-9 at 498. Dr. Buck also completed a third Psychiatric/Psychological Impairment Questionnaire on the same date. Dkt. 14-8 at 449. Dr. Buck reported Ms. Phillips received "variable" treatment though reported similar findings as the August 18, 2009 report. Dkt. 14-8 at 449–56. Dr. Buck noted Ms. Phillips's prognosis as variable and "Fair-Poor."

In a letter dated May 12, 2010, Dr. Buck reported that Ms. Phillips continued to be treated for major depression and PTSD and opined it would be detrimental for Ms. Phillips to attend her disability hearing. Dkt. 14-9 at 543. Further, in a May 12, 2010 general note, Dr. Buck stated that Ms. Phillips had been compliant "attending sessions every 2-3 weeks." Dkt. 14-9 at 545. In a letter dated June 15, 2010, Dr. Buck opined that Ms. Phillips suffered from chronic functional incapacity as a result of her psychiatric conditions. Dkt. 14-9 at 548. Dr. Buck stated that Ms. Phillips struggled with activities of daily living and had worsening symptoms with any stress, increased mental demands, or changes in her environment, which caused her to decompensate. Dkt. 14-9 at 548.

### 3. Social Security Administration's Consultative Psychologist

J. Mark Dobbs, Ph.D. ("Dr. Dobbs") evaluated Ms. Phillips for the Social Security Administration ("SSA") on May 8, 2007. Dkt. 14-7 at 313. Dr. Dobbs reported that Ms. Phillips was suffering from anxiety, depression, and PTSD with several phobias. Ms. Phillips was

observed to be anxious and tearful during the evaluation.  Dkt. 14-7 at 314.  Dr. Dobbs also

noted moderate symptoms of agoraphobia and obsessive compulsion, self-deprecation, and sleep

problems.  Dkt. 14-7 at 317.  He also reported Ms. Phillips met the criteria for PTSD and showed

no signs of neurological impairment.  Dkt. 14-7 at 318.  Dr. Dobbs also noted Ms. Phillips had

difficulty engaging in some daily tasks, but that she does have interests she enjoys, such as

gardening, computer games, and attending garage sales and auctions.  Dkt. 14-7 at 318–19.  Dr.

Dobbs diagnosed PTSD, obsessive compulsive disorder, and agoraphobia secondary to PTSD.

Dkt. 14-7 at 319.  Dr. Dobbs gave Ms. Phillips a GAF score of 50.  Dkt. 14-7 at 319.

**C.**     **The Administrative Hearing**

        **1.**     **Relevant Portion of Ms. Phillips's Testimony**

At the hearing, Ms. Phillips testified that after seven years as a paramedic, she began

having difficulty with the hyper vigilance and stress required by the job.  Dkt. 14-2 at 36.  She

also stated that in the mornings she would turn off her alarm unknowingly, and vomited and dry-

heaved before work, beginning about one year before she stopped working, but she was able to

"battle through it".  Dkt. 14-2 at 36–37.  At that time, Ms. Phillips could not do household chores

or physical activities.  Dkt. 14-2 at 37–38.  She would use the computer or read for several hours

a day, because it distracted her from flashbacks and intrusive memories.  Dkt. 14-2 at 38.  Ms.

Phillips testified that she cried frequently during the day and that she stopped talking to anyone

other than her family.  Dkt. 14-2 at 39.  She further testified that she initially would not leave her

home except to go to doctor appointments, but eventually was able to go to the grocery store if

someone went with her.  Dkt. 14-2 at 39.  She testified that in 2003, she struggled with reading

and following a television program due to poor focus.  Dkt. 14-2 at 39–40.

Ms. Phillips testified she has panic attacks approximately once per week, but in 2003 she dealt more with flashbacks. Dkt. 14-2 at 40. She testified that significant flashbacks happen once or twice a year. Dkt. 14-2 at 41. Ms. Phillips reported that she became frequently overwhelmed beginning in 2003, Dkt. 14-2 at 41, she saw Dr. Buck regularly, and her medications help, but do not relieve her symptoms. Dkt. 14-2 at 42–43. She indicated a strong desire to return to work and to be a productive member of society. Dkt. 14-2 at 44.

Ms. Phillips testified that a 2002 incident with the police triggered the main part of her illness and she learned to "bury things" because she grew up in an abusive family. Dkt. 14-2 at 44. She stated that she enjoys gardening, but that it can be overwhelming at times and she does not always plant the flowers she buys. Dkt. 14-2 at 46. Ms. Phillips testified that she plays games on the computer up to eight hours per day to relax. Dkt. 14-2 at 46. Ms. Phillips stated that she enjoyed attending auctions, but had not been to any since 2006 or 2007. Dkt. 14-2 at 47. She also testified that she reads fantasy novels for up to three hours per day. Dkt. 14-2 at 48. Ms. Phillips stated that she used to sell things she bought at auctions on the internet, but that she stopped due to the stress. Dkt. 14-2 at 48–49.

### 2.      Relevant Portion of Vocational Expert's Testimony

Vocational Expert, John E. Grenfell, Ed.D., (the "VE") testified that an individual with Ms. Phillips's paramedic position would have skills that would transfer to sedentary positions such as a receptionist in a clinic, doctor's office, or hospital, as well as a medical dispatcher or medical insurance clerk. Dkt. 14-2 at 53–54. Positions with light work included first aid attendant and phlebotomist. Dkt. 14-2 at 55. Positions for light, unskilled, stable work setting, and only occasional interaction with supervisors, co-workers, and the public included a mail clerk, an office helper, and a laundry worker. Dkt. 14-2 at 56. However, the VE reported a

person who describes herself as Ms. Phillips described in her testimony would not be able to engage in any sustained work.  Dkt. 14-2 at 57.  The VE testified an individual who was prone to decompensation who would absent from work three times a month would be unable to work. Dkt. 14-2 at 58.

### 3.    Decision of the ALJ

By a decision dated June 8, 2010, the ALJ found that Ms. Phillips had a serious impairment of PTSD, but that she did not have an impairment that met or medically equaled one of the listings in 20 CFR Part 404, Subpart P, Appendix 1.  Dkt. 14-2 at 16.  Specifically, the ALJ found Ms. Phillips had mild restrictions in activities of daily living, moderate difficulties with social functioning, mild difficulties with concentration, persistence, or pace, and had no extended periods of decompensation.  Dkt. 14-2 at 17.  The ALJ concluded that Ms. Phillips's mental impairment did not cause at least two marked limitations, or one marked limitation and "repeated" episodes of extended decompensation; therefore, Ms. Phillips did not meet Listing "B" criteria.  Dkt. 14-2 at 17.  Additionally, the ALJ found that Ms. Phillips retained the residual functional capacity ("RFC") to perform work that did not require stringent speed or production requirements, work in a stable setting, and with only occasional interaction with supervisors, co-workers, and the public.  Dkt. 14-2 at 18.  The ALJ determined Ms. Phillips could perform work as a mail clerk, office helper, and laundry worker.  Dkt. 14-2 at 24–26.

In making these conclusions, the ALJ considered the medical evidence and Ms. Phillips's testimony.  The ALJ found that Ms. Phillips's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible.  Dkt. 14-2 at 19, 23.  Furthermore, the ALJ assigned little to no weight to the opinions from Dr. Buck, and stated in detail why they were not supported by Ms. Phillips's actual functionality or Dr. Buck's examination findings as

reported in treatment notes. *See* Dkt. 14-2 19–23.   The ALJ gave partial weight to the SSA consultant's report.   Dkt. 14-2 at 23.   In sum, the ALJ found that the "residual functional capacity assessment is supported by the full evidence contained within the file, the claimant's own testimony and her ability to function."   Dkt. 14-2 at 24.   The ALJ accounted for Ms. Phillips's mental impairment by limiting her to "unskilled work with no stringent speed or production requirements; stable work setting; and with occasional interaction with supervisors, co-workers, and the public."   Dkt. 14-2 at 24.

## II.   <u>DISABILITY AND STANDARD OF REVIEW</u>

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A).   In determining whether a claimant is disabled, an ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Id.*  Although a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307.  An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence."  *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.   DISCUSSION

Ms. Phillips contends the ALJ did not give proper weight to her treating physician, erroneously determined she was not disabled under Medical Listings 12.04 and 12.06, and misjudged her credibility.

**A.   Whether the ALJ Unreasonably Weighed the Medical Opinion of Non-Examining Physicians and Did Not Give Proper Weight to the Treating Physician**

The Seventh Circuit has repeatedly addressed the appropriate standards that an ALJ must follow when weighing the opinions from treating physicians.  "A treating physician's opinion that is consistent with the record is generally entitled to 'controlling weight.' An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection."  *Jelinek v. Astrue*, 662 F.3d 805 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2))).

Ms. Phillips argues the ALJ did not give proper weight to her treating physician. Specifically, she argues that her treating psychologist, Dr. Buck, based her opinion on appropriate objective findings, and her opinions were not contradicted by any other medical opinions that could be considered substantial evidence.  However, the ALJ did give a reasoned explanation for giving Dr. Buck's opinions little to no weight.  The ALJ stated that Dr. Buck's opinions were inconsistent with her treatment notes from Ms. Phillips's sessions, in which Ms.

18

Phillips reported feeling better and having the ability to complete daily activities.  Specifically, the ALJ noted that Ms. Phillips's ability to attend auctions, buy items, and then resell them demonstrated a high degree of functionality, namely, an ability to purchase and resell items for profit, along with the degree of public interaction necessarily required for such actions.  Dkt. 14-2 at 21.  Further, the ALJ found the break in treatment from 2003 to 2006 and variable treatment schedule at odds with Dr. Buck's opinions.

Ms. Phillips argues that in the mental health context, Dr. Buck could do no more than rely on psychiatric findings of poor memory, mood disturbances, emotional instability, recurrent panic attacks, and other observations of Ms. Phillips's symptoms.  Additionally, Dr. Buck's notes contain reports from Ms. Phillips that she was depressed, anxious, had recollections of trauma, and other symptoms. *See Slayton v. Astrue*, 1:07-cv-80, 2008 WL 425465, at *11 (N.D. Ind. Feb. 13, 2008) (stating that psychiatric problems are "not as readily amenable to substantiation by objective laboratory testing as a medical impairment") (quoting *Paulin v. Bowen*, 817 F.2d 865, 873-74 (C.A.D.C. 1987)); See *Clester v. Apfel*, 70 F. Supp.2d 985, 990 (S.D. Iowa 1999). Thus, Ms. Phillip asserts the ALJ's reasoning that Dr. Buck's findings lacked "objective" support, was unsound.

However, a reading of the treatment notes also reveals that Ms. Phillips reported improvements and the ability to do certain tasks outside of the home.  Further, as will be discussed below, the ALJ found Ms. Phillips's testimony was inconsistent with her reports in Dr. Buck's treatment notes.  Given the standard of review and the Court's inability to reweigh the evidence, the Court finds that the ALJ gave a sound explanation for rejecting Dr. Buck's opinion and supported the explanation with substantial evidence.

Ms. Phillips also argues the ALJ improperly gave weight to non-examining physicians, including the functional capacity assessment by Kenneth Neville, Ph.D. ("Dr. Neville).  Dr. Neville reviewed Ms. Phillips's claim file on June 12, 2007and opined that Ms. Phillips was "likely to have difficulty with activities or work requiring frequent social interaction and extensive concentration skills, though Ms. Phillips does seem capable of performing simple, unskilled work on a sustained basis."  Dkt. 14-7 at 322.  William Shipley, Ph.D. ("Dr. Shipley"), affirmed Dr. Neville's opinion on March 26, 2008 after simply noting there was no new evidence.  Dkt. 14-7 at 344.  However, neither Dr. Neville nor Dr. Shipley ever examined Ms. Phillips.  The Seventh Circuit has held that opinions from non-examining physicians, standing alone, are not substantial evidence.  *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("[A] non-examining physician opinion does not, by itself, suffice as substantial evidence."); *see also Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (same).

The examination of a claimant is particularly important when dealing with mental impairments.  *See Phillips v. Astrue*, 413 F. App'x 878, 855 (7th Cir. 2010) (finding that doctor who never saw claimant should not have been given the only weight of the evidence since his opinion was the only contradictory evidence provided); *see also Westphal v. Eastman Kodak Company*, No. 05-CV-6120, 2006 WL 1720380 * 5 (W.D.N.Y. June 21, 2006) ("Because of the inherent subjectivity of a psychiatric diagnosis, and because a proper diagnosis requires a personal evaluation of the patient's credibility and affect, it is the preferred practice that a psychiatric diagnosis be made based upon a personal interview with the patient."); *Bethea v. Astrue*, No. 3:10-cv-744 (JCH), 2011 WL 977062, at *11 (D. Conn. March 17, 2011) (relying on *Westphal* in Social Security context).  However, the Seventh Circuit has also advised that it "is well known [that] many physicians (including those most likely to attract patients who are

thinking of seeking disability benefits) will often bend over backwards to assist a patient in

obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In this case

however, the inconsistencies between Dr. Buck's opinion and the evidence cited by the ALJ gave

her a reasonable basis for discounting Dr. Buck's opinion and giving weight to the non-

examining physicians. *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an

opinion is with the record as a whole, the more weight we will give that opinion."). Moreover,

the ALJ did not rely solely on the non-examining physicians' reports, but relied on Ms. Phillips's

reports and Dr. Buck's treatment notes in reaching her conclusion. The Court finds the ALJ did

not improperly discount the treating physicians' opinion.

**B.     Whether the ALJ Erroneously Determined Ms. Phillips's Disability Does Not Meet
        or Medically Equal Listing 12.04 or 12.06**

The burden of proof is on Ms. Phillips to show her impairments met or equaled a listing

under 20 CFR. Part 404, Subpart P, Appendix 1, section 12.04B.[4]  *Maggard v. Apfel*, 167 F.3d

376, 380 (7th Cir. 1999). Furthermore, the Supreme Court has emphasized that, "for a claimant

to show that his impairment matches a listing it must meet all of the specified medical criteria."

*Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990); *see Sims v. Barnhart*, 309 F.3d 424, 428 (7th

Cir. 2002). The Seventh Circuit has indicated that when a claimant contends the ALJ erred in

her listing finding, remand is not appropriate unless the claimant identifies evidence ignored by

the ALJ indicating that she at least may have met or equaled a listing. *Cf. Sims*, 309 F.3d at 429

("Moreover, none of the evidence that Sims contends the ALJ ignored or misstated establishes

that her impairments met or equaled in severity the criteria under a listing.").

The relevant portions of Medical Listings 12.04 criteria are:

---

[4] To meet these listings, a claimant must meet both the A and B criteria, or just the C criteria. 20 C.F.R. Pt. 404,
Subpt.P, App. 1, § 12.04. Ms. Phillips has not alleged that she met the C criteria, so only the B criteria are at issue.
The B criteria for Listing 12.06 are identical to the criteria for Listing 12.04.

Affective disorders:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.  The required levels of severity for these disorders are met when the requirements in both A and B are satisfied. . . .

B. Resulting in at least two of the following:
1.  Marked restriction of activities of daily living;
2.  Marked difficulties in maintaining social functioning;
3.  Marked difficulties in maintaining concentration, persistence, or pace;
4.  Repeated episodes of decompensation; each of extended duration.

The ALJ did not dispute that Ms. Phillips satisfied the "A" criteria of the Medical Listings.  However, under the "B" criteria, the ALJ found Ms. Phillips had moderate limitations in social functioning since she had a few friends she socialized with, she was able to go outside, attend auctions/garage sales, drive her son to football practice, and take her son to the store.  Dkt. 14-2 at 17.  The ALJ found mild limitations in concentration, persistence, or pace because Ms. Phillips was able to read, play computer games, could count change, write in her journal, and finish tasks.  Finally, the ALJ found no episodes of decompensation were documented or alleged.  Dkt. 14-2 at 17.

Ms. Phillips argues that in determining the criteria, the ALJ did not address any of the findings from Dr. Buck at step three of the "B" criteria.  Dr. Buck found Ms. Phillips had marked limitations in social functioning, Dkt. 14-8 at 396, and concentration, persistence, or pace, Dkt. 14-8 at 395–96, as well as episodes of decompensation[5], Dkt. 14-8 at 397.  Ms. Phillips also argues there is no conflict in the activities she did and a finding that she should be psychiatrically disabled under the "B" criteria.  Ms. Phillips notes the regulations specify that even when a

---

[5] Decompensation is defined under 20 C.F.R. Part 404, Subpart P, Appendix 1, in section 12.00 Mental Disorders:
…Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

claimant can perform many simple tasks, she may have marked restriction in concentration, persistence, or pace if the claimant cannot perform the tasks without extra supervision, assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.  Thus, Ms. Phillips argues, her undertaking of simple tasks does not prevent a finding of psychiatrically disabled under the Listings.  *See Bauer v. Astrue,* 532 F.3d 606, 608–09 (7th Cir. 2008) (holding that the fact that a claimant who suffered from mental impairments could dress appropriately, shop for food, prepare meals, perform chores, take care of hygiene, and care for a 13 year old son only meant that the plaintiff was "not a raving maniac who needs to be locked up" but did not contradict opinions of disability from the treating mental health professionals).

Specifically, Ms. Phillips argues the ALJ did not address Dr. Buck's findings at step four of the "B" criteria. Dr. Buck found Ms. Phillips suffered from episodes of decompensation or deterioration and that Ms. Phillips's medications were changed or increased due to her symptomatology.  *See, e.g.*, Dkt. 14-252, 296, 376, 379.  The Seventh Circuit has acknowledged that a "significant alteration in medication" can support this element of the listing, *see Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010), but Ms. Phillips fails to establish that in her case, switching medication is a "significant alteration." Additionally, The ALJ was justified in finding no extended periods of decompensation, as none have been documented or alleged, other than Dr. Buck's conclusory statements that Ms. Phillips suffers from decompensation. For example, the ALJ considered that although Dr. Buck indicated Ms. Phillips suffered from episodes of decompensation in the July 9, 2008 impairment questionnaire; in her June 12 and July 1, 2008 sessions Dr. Buck noted that Ms. Phillips was selling items on eBay and the Trader, went to

auctions and purchased antiques, all activities which require a high degree of concentration, attention and public interaction. Further, the ALJ considered that Ms. Phillips report that she was "doing better". (*See,* Dkts. 14-8 at 387, 14-9 at 523).

Although Ms. Phillips has identified evidence that in her view supports a finding that she meets or medically equals the listing, the Court finds Ms. Phillips has not met her burden of demonstrating that the ALJ ignored or did not give proper weight to such evidence. Because Ms. Phillips's mental impairments do not cause at least two "marked limitations or one "marked limitation" and "repeated" episodes of decomposition, each of extended duration, the paragraph "B" criteria are satisfied.

**C.      Whether the ALJ Improperly Determined Ms. Phillips's Credibility**

Ms. Phillips argues the ALJ improperly found that her allegations were "not credible to the extent they are inconsistent with [her] residual functional capacity assessment." Dkt. 14-2 at 19.  An ALJ is not "obliged to believe all [of a claimant's] testimony . . . and [ ] is free to discount the applicant's testimony on the basis of the other evidence in the case."  *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).  The Court will not overturn an ALJ's credibility determination unless it is patently wrong.  *Skarbeck v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

The Court notes that the ALJ found numerous inconsistencies between Ms. Phillips's testimony about the severity of her disability, daily activity reports at appointments, and variable treatment as a basis for discrediting Ms. Phillips's testimony.  For example, the ALJ found it inconsistent that Ms. Phillips alleged her disabling mental impairment is related to a police raid in 2002, however, she did not file a request for disability until 2007; and she testified she could perform no household chores or physical activities during 2003, but the records reflect that she

was attending garage sales and auctions in 2003 and selling items on E-Bay.  At the hearing, Ms. Phillips testified that she had stopped attending auctions in 2007 and had not sold anything "in years"; however, she reported that she was doing both activities as late as October 2008.  The ALJ found Ms. Phillips's sporadic mental health treatment to be inconsistent with her claim of a disabling mental impairment as she provided no records of mental health treatment from 2003 to 2006 and the records she did provide evidenced missed appointments and gaps in treatment. Furthermore, the ALJ gave specific examples and reasoning and found there were no objective findings which supported the level of impairment alleged. The ALJ considered that Ms. Phillips consistently reported that she was doing better, her medication helped and she was functioning well enough to perform activities of daily living such as attending to her personal care, cleaning house, cooking, driving her son to football practice, going to the store once a week with her mother, reading or playing computer games for several hours a day and finishing what she started.  The Seventh Circuit has found these types of activities relevant to credibility.  *See e.g.* *Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003) (reported activities of watching television and reading books supported ALJ's credibility finding); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) ("cook meals," "once in a while did laundry," "grocery shopping, went to the mall, dined out, visited with friends, and played cards."). The Court finds that the ALJ supported her decision to discount Ms. Phillips's testimony due to the other evidence in the case, and that the ALJ was not patently wrong to do so.

**D.     Whether the Hypothetical Question Posed to the Vocational Expert was Flawed**

Finally, Ms. Phillips contends the ALJ posed a flawed hypothetical question to the VE because the question did not include all the limitations caused by Ms. Phillips's medical impairments.  However, as the Court has found above, the ALJ reasonably discredited Ms.

Phillips's testimony and Dr. Buck's opinions.    Therefore, the hypothetical question was supported by the limitations in the record.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds the ALJ's decision is supported by substantial evidence.  The decision of the Commissioner is **AFFIRMED**.

SO ORDERED.

Date:  12/05/2012


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana




DISTRIBUTION:

Eddy Pierre Pierre
LAW OFFICES OF HARRY J. BINDER AND CHARLES E. BINDER, P.C.
fedcourt@binderandbinder.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov